# IN THE COURT OF APPEALS OF IOWA

No. 16-0417
Filed August 16, 2017

**JESUS JAVIER DUENAS,**
       Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
       Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Jeanie K. Vaudt,

Judge.

Jesus Duenas appeals the district court's denial of his application for

postconviction relief following his 2011 conviction for robbery in the first degree.

**AFFIRMED.**

Alexander Smith of Parrish Kruidenier Dunn Boles Gribble Gentry Brown

& Bergmann, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant

Attorney General, for appellee State.

Considered by Doyle, P.J., Bower, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

**MAHAN, Senior Judge.**

Jesus Duenas appeals the district court's denial of his application for postconviction relief (PCR) following his 2011 conviction for robbery in the first degree. Upon our review, we affirm the court's order denying Duenas' application for postconviction relief.

## I.    *Background Facts and Proceedings*

In its decision affirming Duenas' conviction on direct appeal, this court set forth the following facts surrounding the incident leading to Duenas' charge:

> On January 22, 2011, at approximately 1:20 p.m., Bianca Mireles heard a noise like the door "being forced open" in the basement of her Des Moines home. Bianca looked downstairs and saw two men. The men saw Bianca then "turned around" and "ran." Bianca called her brother, Miguel, to ask if he could come home because she was "scared" and "thought someone had just broken in." Miguel told Bianca to lock the doors and that he was on his way. Bianca stayed on the phone with Miguel as she walked downstairs to lock the door. As Bianca approached the door, she saw "the two guys talking to each other."
> The men noticed Bianca. One of the men "pulled out a gun" and pointed it at her. The man with the gun then walked toward Bianca, "grabbed" her by her hair, and "slammed" her head against the wall and a door. The man "threw [Bianca] on the floor" and started kicking her in the face, back, and the back of her head. He then hit her head with the gun, and yelled "to give him money" and "give him [her] phone." The other man went upstairs briefly and then said, "Let's go." The two men then "ran out the same door" in the basement. Des Moines police officers arrived shortly thereafter.
> Bianca stated the man with the gun was wearing a "black hoodie" during the robbery. Bianca recognized the man as "Gremlin," also known as Jesus Duenas. Bianca stated she knew Duenas because he had dated her friend, Cammy. At one point while the man with the gun was beating her, Bianca said, "Gremlin, why are you doing that?" to which the man said "Shut up." The following day, Bianca identified Duenas from a line-up with six photographs shown to her by police. Bianca also identified Duenas at trial. Bianca stated she was "100 percent sure" the man with the gun was Duenas. Bianca could not identify the other man.

Miguel's testimony corroborated Bianca's recollection of the phone call that took place during the course of the robbery. Miguel called the police after his phone call with Bianca disconnected.

During an interview with police, Duenas stated he was working during the time of the robbery and that he had only left work to have lunch at Target. Police contacted Duenas' employer, West Glen, to obtain surveillance records. West Glen Operations Manager Jodi Runge testified that West Glen tracks entry into most buildings with records of digital key-fob use and surveillance video. The records for Duenas on the day of the robbery revealed a gap in the time-log between 11:48 a.m. and 2:43 p.m. Video surveillance showed Duenas walking south off West Glen property—not in the direction of Target—at approximately 11:48 a.m. Video surveillance showed Duenas returning to the property as a passenger in a car at 2:26 p.m. Duenas then entered a West Glen bathroom and left a black hooded sweatshirt in a stall.

The State charged Duenas with robbery in the first degree. The jury found Duenas guilty as charged. The court sentenced Duenas to serve a twenty-five year prison term, subject to a mandatory minimum sentence of seventy percent. Accordingly, Duenas' mandatory minimum sentence was seventeen-and-a-half years.

*State v. Duenas*, No. 11-1565, 2012 WL 4097278, at *1-2 (Iowa Ct. App. Sept. 19, 2012) (footnote and citation omitted). The court affirmed Duenas' conviction, rejecting his challenge to his sentence as being cruel and unusual punishment as applied to him. *Id.* at *2-3.

Duenas filed a PCR application, claiming the district court abused its discretion by admitting testimony from Des Moines Police Officer Jeffrey Shannon regarding the West Glen surveillance video without admitting the video itself. Duenas later filed an amended PCR application through counsel, claiming trial counsel was ineffective in failing to obtain the surveillance video and the State suppressed exculpatory evidence by withholding the video. Following a hearing, the PCR court entered an order denying Duenas' claims.

Duenas appeals. Facts specific to his claims on appeal will be set forth below.

## II.    Standard of Review

We typically review the district court's ruling on a PCR application for correction of errors. *Nguyen v. State*, 878 N.W.2d 744, 750 (Iowa 2016). However, we conduct a de novo review of applications raising constitutional infirmities, including claims of ineffective assistance of counsel. *Id.*

## III.    Ineffective Assistance of Counsel

As part of his investigation, Officer Shannon questioned Duenas about his whereabouts on January 22, 2011, the day of the robbery. Duenas changed his story a few times before telling Officer Shannon he was at work at West Glen Town Center from 9:00 a.m. to 3:00 p.m., except for his lunch break at noon when he went next door to Target and ate alone for about one-half hour before returning to work. The robbery took place at approximately 1:00 p.m.

Officer Shannon reviewed video surveillance from Duenas' employer to determine the validity of Duenas' alibi. From the surveillance video, Officer Shannon learned Duenas actually left work for more than two and one-half hours that day. At trial, Officer Shannon testified about his observations of the surveillance video, stating, "11:48 [a.m.] was the time that [Duenas] was in the main lobby leaving, approximately 11:48," and he "walked out of the building and then had walked south towards Mills Civic Parkway." Officer Shannon further testified, "Didn't see him again after the 11:48 time until about 2:26 p.m.," at which time he was "[c]oming back, pulling up . . . and getting out of a car."

The time stamp on the video shows Duenas leaving work at "17:48" and getting dropped back off at work at "20:26." Duenas then left in the same car at "20:42." If the time stamp was correct, it would have Duenas leaving work at 8:42 p.m.; however, the video showed it was light outside when he left. The PCR court concluded, and we agree, considering the "ambient light" on the video (in January in Iowa, sunset is between 5:00 and 6:00 p.m.) and Duenas' testimony about his work schedule, it is clear the video surveillance time stamp is incorrect.

On appeal, Duenas contends his trial counsel was ineffective in failing to obtain the surveillance video or use it to impeach Officer Shannon's testimony. According to Duenas, "The video would have undercut the State's impeachment of [his] alibi defense"; "[i]f prior counsel had cross-examined the officer with the help of the video, the jury would have learned that Officer Shannon's testimony was incorrect, and placed substantial doubt in the State's timeline."

To prevail on a claim of ineffective assistance of counsel, Duenas must show "(1) counsel failed to perform an essential duty; and (2) prejudice resulted." *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "If we conclude [Duenas] has failed to establish either of these elements, we need not address the remaining element." *State v. Thorndike*, 860 N.W.2d 316, 320 (Iowa 2015); *State v. Clay*, 824 N.W.2d 488, 501 n.2 (Iowa 2012) ("The court always has the option to decide the claim on the prejudice prong of the *Strickland* test, without deciding whether the attorney performed deficiently."). We elect to address Duenas' claim on the prejudice prong.

In addition to the video surveillance, on the day at issue, Duenas' time card showed he punched into work at 9:34 a.m. and punched out at 2:46 p.m. Duenas' key-fob report showed he used his card to access certain areas at 9:39, 10:05, 10:13, 10:14, 11:02, 11:03, 11:42, 11:44, 11:46, and 11:48 a.m., with no activity again until 2:43 p.m., which was also the last time Duenas used his card that day.[1] Despite the obvious time-stamp discrepancy, the video surveillance showed that Duenas left work during the middle of his shift, he "walked in the opposite direction of Target" (where he said he ate lunch), and he returned to work two and one-half hours later. When Duenas returned to work, he went into the bathroom wearing "what appeared to be a coat or sweatshirt," and "[w]hen he exited the bathroom, he wasn't wearing it any longer."[2] Duenas clocked out for the day shortly thereafter and left work in the same car that had just dropped him off.

Upon our review, considering the evidence presented to the jury, we conclude the discrepancy between the time stamp and the times testified to by Officer Shannon would not have impeached the officer's credibility. Given the slight potential impeachment value of the surveillance video and the overwhelming evidence of his guilt,[3] Duenas has not shown a reasonable probability the outcome of his trial would have been different had trial counsel obtained the surveillance video and attempted to use it to impeach Officer Shannon's testimony. *See Thorndike*, 860 N.W.2d at 320 (setting forth the

---

[1] It was possible, however, for Duenas to work in areas of the building without using his key fob.

[2] Officers later found a black hooded sweatshirt in the bathroom.

[3] Additional evidence of Duenas' guilt is set forth above in our recitation of the background facts of the case.

standard to establish prejudice as "whether there is a reasonable probability that, absent [counsel's alleged deficiencies], the factfinder would have had a reasonable doubt respecting guilt" (quoting *Strickland*, 466 U.S. at 695)). In sum, Duenas has not established the prejudice prong of his ineffective-assistance-of-counsel claim, and we affirm on this issue.

## IV.	*Suppression of Exculpatory Evidence*

Duenas also contends the State suppressed exculpatory evidence—i.e., the surveillance video, which "he could have used to impeach the police officer and prove his alibi defense"—in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

The PCR court determined the surveillance video was not suppressed. We agree. Evidence is considered suppressed "when information is discovered after trial 'which had been known to the prosecution but unknown to the defense.'" *Harrington v. State*, 659 N.W.2d 509, 522 (Iowa 2003) (citation omitted). At the PCR hearing, Duenas' trial counsel testified he "heard the first time about some kind of surveillance tape" *at* trial, not *after* trial. Moreover, as the PCR court acknowledged, Duenas stated he was aware of the surveillance video when he was charged because it was discussed in the trial information and at his preliminary hearing. The surveillance video was also discussed at Officer Shannon's deposition. Duenas stated he recalled discussing the video with trial counsel prior to trial.

In any event, because the video was discussed at trial and Duenas' attorney had an opportunity to decide what course of action to take at that time, we conclude the evidence was not suppressed. *See State v. Bishop*, 387 N.W.2d 554, 559 (Iowa 1986) (stating where evidence is "disclosed during trial and at a meaningful time, due process has not been denied"); *see also State v. Veal*, 564 N.W.2d 797, 810 (Iowa 1997) ("Evidence is not considered 'suppressed' if the defense is able to take advantage of it at trial."), *overruled in part on other grounds by State v. Hallum*, 585 N.W.2d 249 (Iowa 1998).

In light of our conclusion the video was not suppressed, we need not address the remaining elements of Duenas' *Brady* claim,[4] and we affirm on this issue.

## V. *Conclusion*

Upon consideration of the issues raised on appeal, we affirm the court's denial of Duenas' application for postconviction relief.

**AFFIRMED.**

---

[4] The PCR court went on to find, "Even if the tape had been suppressed, it was not material, as there is not a reasonable probability that the outcome of Mr. Duenas' trial would have been different had the tape been disclosed." *See, e.g.*, *Harrington,* 659 N.W.2d at 516 ("[T]o establish a *Brady* violation, the defendant had to prove '(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issue of guilt.'" (citation omitted)).